In the Matter of MAINE SUGAR OF MONTEZUMA, INC., Petitioner, v. DON J. WICKHAM, as Commissioner of Agriculture and Markets, Respondent.

Third Department, November 18, 1971.

*Woods, Oviate, Gilman, Sturman & Clarke (Beryl Nusbaum of counsel), for petitioner.*

*Thomas G. Conway* and *Dennis P. Buckley* for respondent.

GREENBLOTT, J. This is a proceeding under article 78 of the CPLR (transferred to the Appellate Division of the Supreme Court in the Third Judicial Department by order of the Supreme Court at Special Term, entered January 21, 1971 in Albany County) to review a determination of the respondent Commissioner of Agriculture and Markets made on August 4, 1970 which revoked the commission merchant, dealer, net-return dealer or broker license previously issued to the petitioner for the license year ending June 30, 1970.

During 1969, petitioner's predecessor, New York Sugar Industries, Inc., entered into numerous uniform contracts with farmers in the State of New York providing for the purchase of sugar beets. On May 13, 1970 the Commissioner of Agriculture and Markets issued a notice of hearing requiring petitioner to show cause why its license should not be revoked for a violation of subdivision 3 of section 246 of the Agriculture and Markets Law on the ground that it failed to make payment without reasonable cause for farm products it purchased. Hearings were held on May 25, 1970, June 16, 1970, and June 30, 1970. The license expired on June 30, 1970. On August 4, 1970, at which time no renewal of the license application was pending or was sought, respondent revoked petitioner's license on the ground that petitioner had no reasonable cause to fail to pay for beets delivered prior to December 1, 1969, on or before December 15, 1969. In his findings of fact the Commissioner had determined that the contract set up an absolute minimum payment of $14 a ton and required a payment of 75% of that amount by December 15, 1969.

Petitioner first contends that the Commissioner's decision should be vacated since it was made after the license had already expired. This position is without merit. Respondent is charged with a continuing statutory responsibility '' to suppress unfair and fraudulent practices '' in the sale of farm products and '' to safeguard the producers of this state in certain marketing transactions relative to such farm products '' (Agriculture and Markets Law, § 244). It is important that respondent file an order either dismissing the proceeding or revoking the license (Agriculture and Markets Law, § 251-e) because the statute

provides that respondent shall deny a new application for any person or corporation whose license has previously been revoked (Agriculture and Markets Law, § 251). Since the administrative action was timely commenced, it should not be rendered void because the final determination was made after the expiration of the license. (See *Matter of Hacker* v. *State Liq. Auth.,* 19 N Y 2d 177; *Matter of Brooklyn Audit Co.* v. *Department of Taxation & Finance,* 275 N. Y. 284.)

Petitioner next contends that respondent's decision is not supported by substantial evidence in the record since respondent ignored the provisions of paragraphs 5 and 8 of the contract. It was petitioner's position: that under the contract any claims of nonpayment by the growers were premature; that the beets did not meet the contract standards; that petitioner was obligated only to make a payment of 75% of the amount it, in its sole discretion, determined was due by December 15, 1969; that it had made such a payment; and that the balance was not due until October 31, 1970.

Paragraph 4 of the contract sets forth the standards which the beets had to meet in order to comply with the contract terms. It provides in part as follows: " All beets delivered hereunder shall be normal, sound, and ripe beets topped below the leafline and having at least four per cent (4%) mark content from which cossettes are available with a mush-portion (i.e., particles of less than 0.4 in. length) of not more than five per cent (5%) and from which a raw juice of a purity of at least eighty-five per cent (85%) and a thin juice of a purity of ninety per cent (90%) can be produced.'' The chief chemist and plant manager of petitioner testified that the test results were as follows: mark content 3.97%; mush-portion 7.96%; raw juice 86.00%; and thin juice 87.88%. He conceded that the tests were not separately performed upon the beets delivered by New York State growers, but that all of the tests were run on the commingled mass of beets that passed through the plant at Easton, Maine. This commingled mass of beets included beets received from growers in Pennsylvania, New Jersey, Maine or New York. All of the beets thus lost their identity. Since there were no separate tests of the beets delivered by the New York growers under the contracts, petitioner's claim that the beets did not meet the contract standards must fail. Nowhere in paragraph 4 is there language providing that the quality of beets grown in other States or by other farmers will affect the price paid to a grower in New York State. Paragraph 4 states that " [t]he grower agrees that all beets grown and delivered by him here-

under shall be ". Petitioner offered no separate tests results on any beets delivered under a New York contract. That portion of the contract (par. 6) which provides for "factory beet laboratory tests" to determine the amount of sugar in all the beets delivered (upon which the price of the beets to the individual growers is determined) dealt solely with that objective; it did not concern any tests to determine the quality of any beets. Moreover, the contract specifically empowered the petitioner to reject beets which did not meet the contract specifications. None of the beets were rejected. Accordingly, petitioner's failure to notify growers at any time of any alleged defect in quality could be construed to be an acceptance of the goods. (Uniform Commercial Code, § 2–606.)

Paragraph 8 of the contract provides: "An initial payment hereunder shall be made by The Company on or before December 15, 1969, for beets delivered hereunder prior to December 1, 1969, and an initial payment shall be made on or before the 15th day of each calendar month thereafter for beets delivered hereunder during the previous calendar month, for which an initial payment has not theretofore been made, which shall be 75% of the total estimated amount due The Grower for all beets delivered by The Grower hereunder. Such amount is to be determined by The Company in its sole discretion. Further payment will be made by The Company on or before May 1, 1970, if, in the sole discretion of The Company, such further payment is warranted. Final settlement in accordance with the terms of this contract, if any amount be due after credit of all payment theretofore made by The Company to The Grower, shall be made on or before October 31, 1970."

Paragraph 5 of the contract provides, in pertinent part: "The price per ton (2,000 lbs.) of beets delivered hereunder to The Company shall be determined upon the average net return per one hundred (100) pounds of sugar in beets delivered (as defined in Paragraph 6 below) and also upon the average per cent sugar in all beets of the 1969 crop grown and delivered by The Grower to The Company under this contract (as defined in Paragraph 7 below), in accordance with the following schedule, but in no event would a grower receive less than $14.00 per ton at the receiving stations or at Montezuma."

The contract thus provides that the price of beets was to be calculated by a variable formula subject to a minimum floor of $14 per ton. The estimates to be made "by The Company in its sole discretion" obviously could not violate the explicit price terms of the contract. The expression "sole discretion"

can only mean that, subject to the guaranteed minimum price, there was room for discretion on the part of petitioner in estimating a price higher than the absolute floor, to be paid on December 15, the amount to be retained for later payment. Furthermore, because it drafted the contracts, any possible ambiguity must be resolved against the petitioner (*Rentways, Inc.* v. *O'Neill Milk & Cream Co.*, 308 N. Y. 342; *Newberry Co.* v. *Kingston Plaza*, 31 A D 2d 862). Moreover, petitioner itself calculated the first payment due to growers on the basis of 75% of the minimum $14 per ton and actually paid two growers on this basis.

Finally, petitioner's contention that it paid the estimated payments required under paragraph 8 of the contract in the form of a $50,000 check allegedly delivered to the Finger Lakes Sugar Beets Growers Association by officers of the petitioner or its parent company, Maine Sugar Industries, Inc., is without merit. The check was never received in evidence. Aside from this fact, and the fact that the check was made payable to the association and not the individual growers, the check, if distributed among the growers, was estimated to come to a return of merely 34 cents a ton on beets delivered, far less than the minimum amount due of $10.50 per ton.

The remainder of petitioner's contentions has been examined and found to be without merit.

The determination should be confirmed and petition dismissed, with costs.

STALEY, JR., J. P., COOKE, SWEENEY and SIMONS, JJ., concur.

Determination confirmed and petition dismissed, with costs.